In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2608

United States of America,

Plaintiff-Appellee,

v.

Tracee L. Taylor,

Defendant-Appellant,


Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 97 CR 167--Rudy Lozano, Judge.


Argued May 9, 2000--Decided August 21, 2000


  Before Manion, Kanne and Rovner, Circuit Judges.

  Kanne, Circuit Judge.  Tracee Taylor joined two
confederates in a vicious carjacking during which
the trio trapped a pregnant woman in her car,
shot her in the chest and stole the automobile.
Taylor was convicted of committing a carjacking
in violation of 18 U.S.C. sec. 2119, and aiding
and abetting the use of a weapon in connection
with a violent felony in violation of 18 U.S.C.
sec. 924(c). He appeals on three grounds, all of
which we reject.

I.  History

  During the morning of December 8, 1997, Lakesha
Wade was driving to pick her son up from school
in Gary, Indiana. Wade, who was four months
pregnant, noticed a blue 1995 Mitsubishi Mirage
tailing closely behind her 1986 Pontiac
Parisienne. At first, Wade thought nothing of it,
but she became alarmed when the Mitsubishi
continued to pursue her through a number of
turns. Wade accelerated to escape her pursuer,
but the Mitsubishi raced faster in pace. Wade
panicked, running a red light, almost hitting
another car and driving indecisively all over
Gary while trying to decide where to go. She
eventually raced to her sister's residence and
skidded to a halt in the front yard. Wade jammed
her car horn, hoping that someone would come to
the door and let her in the house, but no one

answered. Her sister Lasonia Williams was home but asleep upstairs. Moments later, the Mitsubishi sped into the driveway and blocked Wade's exit.

Kevin Wilson leapt out of the Mitsubishi menacingly wielding a .38-caliber handgun. He screamed, "Bitch, bitch, get out of the car. Get out of the car, bitch. I ain't playing with you, bitch. Get out of the car or I'll kill you, bitch." Wilson ran at Wade, who was still sitting in her car, and shot her through the car door window. The bullet tore through Wade's upper left arm and struck her left breast. Wilson then opened the driver-side door, pulled Wade from the car and sat down in the driver's seat. Wade ran to her sister's door, but Williams, now awake from the mayhem outside, feared for herself and refused to open the door. Wilson soon noticed Williams watching him from inside the house and fired three or four shots at her as she escaped upstairs. Wade ran and hid inside a postal truck parked nearby.

Defendant Tracee Taylor remained inside the Mitsubishi this entire time. The Mitsubishi had been stolen from Taylor's neighbor the day before, and Taylor, Wilson and Patrick Lucas used it to chase down Wade. At this point, Wilson could not get Wade's Pontiac started so he and Lucas pushed it into the street. Taylor slipped into the driver's seat of the Mitsubishi and drove it down the street pushing the Pontiac along. After the threesome departed and the police arrived, Wade was receiving emergency medical treatment from paramedics when she noticed the Mitsubishi returning to the scene of the crime. Aided by Wade's tip, Gary police officer Luis Donald soon spotted the Mitsubishi and chased it until it spun out of a sharp turn and crashed into a car parked along the curb. The three men inside the Mitsubishi sprinted off in different directions, but Donald tackled Wilson and other police captured Taylor in the vicinity. A key ring, which Taylor's sister identified as belonging to Taylor, was found in the Mitsubishi and held keys matching the locks to Taylor's home. The Federal Bureau of Investigation later discovered that Wade's Pontiac, stolen by Taylor, Wilson and Lucas during the carjacking, was originally manufactured in Fairfax, Kansas.

A federal grand jury promptly issued a two-count indictment charging Taylor with violating the federal carjacking statute and aiding and abetting Wilson's use of a firearm during a crime of violence. On August 14, 1998, after a four-day trial, the jury convicted Taylor on both counts of the indictment.

II.  Analysis

   Taylor raises three claims on appeal: (1)
Taylor challenges the sufficiency of the evidence
to establish that he intended to aid and abet
Wilson's use of a firearm in violation of 18
U.S.C. sec. 924(c); (2) Taylor argues that the
federal carjacking statute, 18 U.S.C. sec. 2119,
exceeds Congress's constitutional authority under
the Commerce Clause; (3) Taylor argues the
district court's omission of a jury instruction
on "serious bodily injury" for his carjacking
conviction was plain error.

A.  Sufficiency of the Evidence for 18 U.S.C.
sec. 924(c)

   The jury found Taylor guilty of violating 18
U.S.C. sec. 924(c) by virtue of his assistance to
Wilson's use of a firearm during the carjacking,
but Taylor challenges the sufficiency of the
evidence to establish that he knew beforehand of
Wilson's intent to use a firearm. Typically, we
review the sufficiency of the evidence in the
light most favorable to the government and
reverse only if the record is devoid of evidence
from which the jury could reach a finding of
guilt. See United States v. Johnson-Nix, 54 F.3d
1295, 1302 (7th Cir. 1995); United States v.
Rosalez-Cortez, 19 F.3d 1210, 1215 (7th Cir.
1994). However, our review here requires an even
higher showing from Taylor because he failed to
renew his motion for acquittal at the close of
all evidence or within seven days of the verdict
under Fed. R. Crim. P. 29. See United States v.
Hickok, 77 F.3d 992, 1002 (7th Cir. 1996)
(citations omitted). As a result, "under well-
established precedent in this circuit, [the
defendant] has waived an appellate challenge to
the sufficiency of the evidence and may obtain a
reversal only if he demonstrates 'a manifest
miscarriage of justice.'" Id.
   To convict for aiding and abetting under 18
U.S.C. sec. 924(c), the jury must find that the
defendant knowingly and intentionally assisted
the principal's use of a dangerous weapon in a
violent felony. See United States v. Woods, 148
F.3d 843, 848 (7th Cir. 1998). This requires
finding that (1) the defendant knew, either
before or during the crime, of the principal's
weapon possession or use; and (2) the defendant
intentionally facilitated that weapon possession
or use once so informed. See id. However,
"[m]erely aiding the underlying crime and knowing
that a gun would be used or carried cannot
support a conviction under 18 U.S.C. sec.
924(c)." Id.; see also United States v.
Bancalari, 110 F.3d 1425, 1430 (9th Cir. 1997);
United States v. Medina, 32 F.3d 40, 45 (2d Cir.
1994). Instead, "the defendant must aid and abet

the use or carrying of the firearm." Woods, 148 F.3d at 848.

In this case, the government introduced no direct evidence showing that Taylor knew in advance that Wilson would use a firearm to commit the carjacking. In contrast to the evidence presented in United States v. Woods, 148 F.3d 843, there was no testimony that Taylor asked Wilson before the crime whether Wilson had his gun, then watched Wilson load the gun and bring it with him. However, a reasonable jury could infer from the inherently violent character of carjackings that Taylor either anticipated or knew that Wilson was going to use a weapon. Moreover, during the extended pursuit of Wade, Taylor rode along in the Mitsubishi with Wilson, who was carrying his handgun this entire time, and the jury could reasonably infer that Taylor noticed or learned during the ride that Wilson possessed a weapon.

Even if Taylor did not discover Wilson's planned use of the weapon by this point, Taylor must have so understood once Taylor and his cohorts had trapped their victim at her sister's residence. There, Wilson charged out of Taylor's car wildly brandishing his weapon, shot Wade in the arm and fired three or four shots into the house. Taylor remained just yards away from Wilson this entire time and cannot credibly claim to have missed Wilson's use of a firearm during the carjacking. See, e.g., Haugh v. Booker, 210 F.3d 1147, 1151 (10th Cir. 2000) (inferring knowledge based on the defendant's presence during his confederate's use of a firearm). If Wilson was physically distant or otherwise removed from Taylor's vantage at the time Wilson brandished and used the firearm, we could not automatically presume Taylor's observation and actual knowledge of weapon use. See United States v. Spinney, 65 F.3d 231, 239 (1st Cir. 1995); United States v. Dinkane, 17 F.3d 1192, 1197 (9th Cir. 1994). Such was not the case here; Taylor was present on the scene within yards of Wilson when Wilson shot Wade from close range and discharged several shots into the residence.

At this point, after learning of Wilson's firearm use and while the commission of the carjacking was still ongoing, Taylor continued to participate in the carjacking and facilitated Wilson's escape. Taylor backed the Mitsubishi out of the front yard and used it to push Wade's Pontiac down the road, thus knowingly aiding Wilson's escape from a violent felony in which Wilson used a firearm. Taylor's acts of assistance are more than sufficient to meet the facilitation element, which "once knowledge on the part of the aider and abettor is established,

. . . does not take much to satisfy." Woods, 148 F.3d at 848 (quoting United States v. Bennett, 75 F.3d 40, 45 (1st Cir. 1996)). Less has met the requirement of facilitation in the past. For example, in United States v. Price, 76 F.3d 526, 530 (3d Cir. 1996), the Third Circuit found that the defendant had knowingly facilitated the use of a firearm when he continued to collect money from cash drawers during a bank robbery after the principal had threatened bank employees with a gun. See also Bazemore v. United States, 138 F.3d 947, 949-50 (11th Cir. 1998) (finding facilitation when the defendant drove the principal to the scene of the crime); United States v. Morrow, 977 F.2d 222, 231 (6th Cir. 1992) (finding no miscarriage of justice when the defendant received the protection of his confederate's weapon). Taylor likewise continued to assist Wilson by facilitating Wilson's escape after it was clear that Wilson had used a firearm in the commission of the carjacking.

Manifest miscarriage of justice is perhaps the most demanding standard of appellate review. We will reverse "'only if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking.'" United States v. McKinney, 143 F.3d 325, 330 (7th Cir. 1998) (quoting United States v. Wright, 63 F.3d 1067, 1072 (11th Cir. 1995)). We cannot say that the record is devoid of evidence pointing to guilt or that the evidence is so tenuous that it shocks the conscience. No manifest miscarriage of justice resulted from Taylor's conviction.

B.  18 U.S.C. sec. 2119 and the Commerce Clause

Taylor argues that 18 U.S.C. sec. 2119, the federal carjacking statute under which he was convicted, exceeds congressional authority under the Commerce Clause. The Commerce Clause confers upon Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. Art. I, sec. 8, cl. 3. From 1937 to 1995, the Supreme Court consistently upheld federal legislation against claims that Congress had overstepped its authority under the Commerce Clause. See Perez v. United States, 402 U.S. 146, 150 (1971); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 256 (1964); Wickard v. Filburn, 317 U.S. 111, 128-29 (1942); United States v. Darby, 312 U.S. 100, 118 (1941); National Labor Relations Bd. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37 (1937). However, the Court ended this fifty-eight-year quiescence with United States v. Lopez, 514 U.S. 549 (1995).

Overturning the Gun-Free School Zones Act of 1990, 18 U.S.C. sec. 922(q)(1)(A), the Lopez

Court identified "three broad categories of activity that Congress may regulate under its commerce power": (1) "Congress may regulate the use of the channels of interstate commerce"; (2) "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; (3) "Congress' commerce authority includes the power to regulate those activities having substantial relation to interstate commerce." Lopez, 514 U.S. at 558-59 (citation omitted). The statute in Lopez criminalized the knowing possession of a firearm in a school zone, but did not contain a jurisdictional element that linked the criminalized conduct to interstate commerce or established any substantial relationship to interstate commerce. 18 U.S.C. sec. 922(q)(1)(A) (1988 & Supp. V). The Court struck the statute as unconstitutional because it "is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise." Id. at 561.

More recently, in United States v. Morrison, ___ U.S. ___, 120 S.Ct. 1740, 1759 (2000), the Supreme Court invalidated sec. 40302 of the Violence Against Women Act ("VAWA") (codified at 42 U.S.C. sec. 13981). The VAWA created civil liability for the commission of a gender-based violent crime, but without any jurisdictional requirement of a connection to interstate commerce or commercial activity. 42 U.S.C. sec. 19381(c). The Court explained that in both Lopez and Morrison "the noneconomic, criminal nature of the conduct at issue was central to our decision." Id. at 1750. Furthermore, the Court pointed out that in neither case was there an "'express jurisdictional element which might limit its reach [to those instances that] have an explicit connection with or effect on interstate commerce.'" Id. at 1751 (quoting Lopez, 514 U.S. at 562). In both cases, Congress criminalized activity that was not commercial in nature without including a jurisdictional element establishing the necessary connection between the criminalized activity and interstate commerce.

Nine circuits since Lopez have achieved remarkable unanimity in upholding 18 U.S.C. sec. 2119 under the Commerce Clause. See United States v. Rivera-Figueroa, 149 F.3d 1, 3-4 (1st Cir. 1998); United States v. Cobb, 144 F.3d 319, 321-22 (4th Cir. 1998); United States v. Romero, 122 F.3d 1334, 1339 (10th Cir. 1997); United States v. Hicks, 103 F.3d 837, 848 (9th Cir. 1996); United States v. McHenry, 97 F.3d 125, 126-29 (6th Cir. 1996); United States v. Coleman, 78 F.3d 154, 157-60 (5th Cir. 1996); United States v. Hutchinson, 75 F.3d 626, 627 (11th Cir. 1996);

United States v. Bishop, 66 F.3d 569, 576-83 (3d Cir. 1995); United States v. Robinson, 62 F.3d 234, 236-37 (8th Cir. 1995). These courts have found the carjacking statute constitutional both as a regulation justified by the substantial effect of carjackings on interstate commerce, see, e.g., Rivera-Figueroa, 149 F.3d at 3; McHenry, 97 F.3d at 126-27; Bishop, 66 F.3d at 580, and as a regulation of instrumentalities of interstate commerce. See, e.g., Cobb, 144 F.3d at 322; Bishop, 66 F.3d at 588-90. Without discussing the latter conclusion, we find the former argument particularly persuasive.

Carjacking bears a substantial relationship to interstate commerce and poses a threat that Congress was authorized to address under the Commerce Clause. Congress enacted 18 U.S.C. sec. 2119 in response to the estimated $8 billion to $9 billion annual loss to car theft, which Congress deemed "a very large and lucrative business" and "the nation's number one property crime problem." H. Rep. No. 102-851(I), at 14 (1992) (reprinted in 1992 U.S.C.C.A.N. 2829, 2830). Congress had a rational basis for believing that sec. 2119 would help protect the interstate businesses of automobile manufacturing and sales by addressing the rising property and insurance costs resulting directly from car theft and carjackings. See id.; see also Bishop, 66 F.3d at 578-80. In addition, Congress struck at the burgeoning interstate trade in stolen vehicles and parts expropriated through car thefts and carjackings--activity that is economic and commercial in nature, albeit criminal as well. See H.Rep. 102-85(I), at 14-15; see also United States v. Thomas, 159 F.3d 296, 297-98 (7th Cir. 1998) (treating illegal drug sales as interstate commerce under the jurisdictional element of the Hobbs Act).

The carjacking statute was "an essential part of a larger regulation of economic activity . . . that arise[s] out of or [is] connected with a commercial transaction which viewed in the aggregate, substantially affects interstate commerce." Lopez, 514 U.S. at 561. It was the lead provision of the Anti Car Theft Act of 1992, Pub. L. No. 102-519, comprehensive federal legislation addressing the economic problem of interstate automobile theft. See Bishop, 66 F.3d at 580. In addition to attaching federal sanctions for carjacking, the Anti Car Theft Act accomplished the following: increased penalties for importation and exportation of stolen vehicles and for interstate transportation or possession of such vehicles; criminalized the operation of "chop shops" for dismantling stolen vehicles; provided federal funds for the local anti-car theft committees, ordered the creation

of a national task force on auto theft and fraud; developed a national checking system for detecting automobile title fraud; required marking of automobile parts to combat the use of stolen parts; required strict Custom Service inspections to prevent exportation of stolen vehicles. Unlike the statutes in Morrison and Lopez, which targeted noneconomic violence, sec. 2119 is an integral part of a large-scale federal regulatory effort to protect interstate commerce and attack illegal commercial activity by criminalizing the theft of goods involved in interstate commerce.

Reinforcing this conclusion, sec. 2119 contains a jurisdictional element, applying its reach only to vehicles that have been "transported, shipped, or received in interstate or foreign commerce." As a result of the jurisdictional limitation, sec. 2119 attaches federal penalties only to thefts of vehicles that have traveled in the stream of interstate commerce. Lopez recognized that congressional inclusion of just such a jurisdictional element (absent in Lopez itself) "would ensure, through case-by-case inquiry, that the [regulated conduct] in question affects interstate commerce." Lopez, 514 U.S. at 561. Explaining by contrast, the Court cited former 18 U.S.C. sec. 1202(a) as containing a jurisdictional component that would protect that statute from a Commerce Clause challenge. See Lopez, 514 U.S. at 562. Similarly, in Morrison, the Court noted that sec. 13981 of the VAWA "contains no jurisdictional element establishing that the federal cause of action in pursuance of Congress' power to regulate interstate commerce," but explained approvingly that the Courts of Appeals have uniformly upheld a separate section of the VAWA that contains a limiting jurisdictional element. Morrison, 120 S.Ct. at 1751-52.

To convict under sec. 2119, the jurisdictional element requires the government to prove that the stolen vehicle had traveled in interstate commerce at some time. The government showed that the stolen Pontiac in this case was manufactured in Kansas, sold across state lines and eventually stolen in Indiana. As we explained in United States v. Bell, 70 F.3d 495, 498 (7th Cir. 1995), "the mere movement of [the object of regulation], at some time, across state lines satisfied the commerce element." Accordingly, we have held that the inclusion of a jurisdictional element in 18 U.S.C. sec. 922(g)(1), which required that a weapon must have traveled in interstate commerce to be subject to the statute, was sufficient under Lopez to satisfy the Commerce Clause, at least when coupled with express congressional findings showing that the regulated activity

substantially affected interstate commerce. See Bell, 70 F.3d at 498; see also United States v. Kenney, 91 F.3d 884, 886 (7th Cir. 1996). Repeatedly since Lopez we have held that a jurisdictional element ensures sufficient nexus with interstate commerce to withstand Commerce Clause challenges. See Gillespie v. City of Indianapolis, 185 F.3d 693, 704-05 (7th Cir. 1999) (18 U.S.C. sec. 922(g)(9)); United States v. Wilson, 159 F.3d 280, 285-87 (7th Cir. 1998) (18 U.S.C. sec. 922(g)(8)); United States v. Hardy, 120 F.3d 76, 77 (7th Cir. 1997) (18 U.S.C. sec. 922(u)). The government's showing that the stolen Pontiac had traveled in interstate commerce established the necessary nexus to interstate commerce under the Commerce Clause.

C.  Jury Instruction Omission for Serious Bodily Injury

   Count One of Taylor's indictment alleges that he violated subsection two of 18 U.S.C. sec. 2119, which reads in full:
Whoever, possessing a firearm as defined in section 921 of this title, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall

(1)  be fined under this title or imprisoned not more than 15 years, or both,

(2)  if serious bodily injury (as defined in section 1365 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and

(3)  if death results, be fined under this title, or imprisoned for any numbers of years up to life, or both.

   In Jones v. United States, 526 U.S. 227, 251 (1999), the Supreme Court held that 18 U.S.C. sec. 2119(1)-(3) comprises "three separate offenses by the specification of distinct elements, each of which must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict." Jones, 526 U.S. at 252. The Court explained further that "serious bodily injury," as it appears in sec. 2119(2), represents an essential element, rather than a sentencing enhancement, of the independent offense defined by sec. 2119(2). See id. Taylor's indictment charged him under sec. 2119(2) as required, but Taylor's trial preceded Jones. Without contemporaneous objection from Taylor, the district court did not instruct the jury that "serious bodily injury" is an element of the carjacking offense. In light of Jones, however,

Taylor and the government now agree that the district court erred by omitting a jury instruction on serious bodily injury.

Taylor argues that the absence of an instruction on serious bodily injury requires reversal on appeal. Seeking to avoid the burden of showing prejudice, Taylor claims that the omission of a jury instruction on an essential element of the charged offense is reversible per se, regardless of prejudice. Yet we are instructed otherwise by Neder v. United States, 527 U.S. 1, 8-9 (1999), and Johnson v. United States, 520 U.S. 461, 466 (1997), both of which hold that omission of an offense element is not structural error that fundamentally infects the trial process and necessitates automatic reversal. See also California v. Roy, 519 U.S. 2, 5 (1996). Taylor's failure to object at trial to the incomplete jury instruction resulted in forfeiture of his claim on appeal, and we again review only for plain error. See United States v. Benitez, 92 F.3d 528, 533 (7th Cir. 1996). Under this standard, we affirm unless the error was not only clear in retrospect but also caused a miscarriage of justice, seriously affecting the fairness, integrity or public reputation of the proceeding. See United States v. Hughes, 213 F.3d 323, 328-29 (7th Cir. 2000).

"Serious bodily injury" is defined by the four categories described in 18 U.S.C. sec. 1365(g)(3): "[a] bodily injury which involves (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss and impairment of a bodily member, organ, or mental faculty." No prejudice, and thus no plain error, occurred if the jury would have found beyond a reasonable doubt that Taylor's victim suffered a bodily injury which fits within any of these four categories. See Neder, 527 U.S. at 8-9. In United States v. Johnson-Dix, we interpreted the same terms at issue here--"serious bodily injury" and "extreme physical pain"--although in the sentencing context under a different standard of review. Johnson-Dix, 54 F.3d at 1312. Despite the absence of trial testimony that the victim's pain was "extreme," we found the victim's gunshot injuries, which featured a fractured leg and entry and exit wounds, constituted "serious bodily injury" under U.S.S.G. sec. 2B3.2(b)(4)(B) because the injuries inflicted "extreme physical pain." Johnson-Dix, 54 F.3d at 1312. Although the government presented little direct evidence on the pain suffered by Taylor's victim, Lakesha Wade, it is clear here from the circumstances that the jury would have found that she suffered a bodily injury that involved "extreme physical pain" under 18 U.S.C. sec. 1365(g)(3)(B).

Gunshot wounds, produced by a .38-caliber bullet, fired at close range, that rips through the victim's arm and penetrates her breast, constitute a serious bodily injury that produces extreme physical pain. Here, the jury knew in detail the tight proximity of Wilson to Wade when he shot her, understood that the .38-caliber bullet shattered Wade's driver-side window and tore through her arm into her chest and heard that Wade was treated by paramedics and taken to the hospital for treatment. In addition, the government introduced into evidence color photographs displaying Wade's gunshot wounds just hours after the carjacking. After asking Wade about these pictures, the government asked apologetically, "I know it sounds like a silly question, but did you experience pain from this?" She answered succinctly in the affirmative and explained that her arm and breast were swollen and "bruised up real bad." Wade did not testify directly that she was in "extreme" pain in those words (nor was she asked), but "[j]uries may use common sense to evaluate the evidence and make reasonable inferences from it." United States v. Cunningham, 54 F.3d 295, 299 (7th Cir. 1995). A rational jury would have found beyond a reasonable doubt that the gunshot wounds of Taylor's victim constituted a serious bodily injury that inflicted extreme physical pain. We find that the omission of a jury instruction on the issue was harmless under the circumstances.

III.  Conclusion

For the foregoing reasons, we Affirm Taylor's convictions.